UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUILLERMO M. R.,<br><br>    Petitioner,<br><br>  v.<br><br>POLLY KAISER, et al.,<br><br>    Respondents. | Case No. 25-cv-05436-RFL<br><br>**ORDER GRANTING PRELIMINARY INJUNCTION**<br><br>Re: Dkt. No. 2 |

**I. INTRODUCTION**

More than two years ago, in March 2023, an Immigration Judge ("IJ") released Petitioner Guillermo M.R. from immigration detention after a hearing, based on a determination that he did not pose a risk of flight or danger to the community. In so holding, the IJ reached a different conclusion than U.S. Immigration and Customs Enforcement ("ICE"), which had repeatedly rejected Petitioner's requests for release.

Despite the IJ's ruling, on June 26, 2025, ICE told Petitioner that it planned to detain him at his mandatory check-in five days later. ICE contends that it may unilaterally determine that Petitioner should be re-detained, regardless of whether there has been any material change in circumstance since the IJ's release decision. In ICE's view, Petitioner is not entitled to any hearing in front of a neutral decisionmaker, either before his re-detention or shortly afterwards, to evaluate whether ICE's assessment is correct. Instead, according to ICE, Petitioner's only recourse is to make an oral request for release to ICE agents upon detention, and if that is not successful, to ask ICE supervisors to reconsider his detention after three months and again after six months. ICE notes that once Petitioner has been detained for more than six months, a

1

preliminary injunction in another case may require a hearing before an IJ.

Petitioner has filed a petition for writ of habeas corpus, alleging that his detention without a hearing before a neutral decisionmaker would violate his constitutional right to due process. Petitioner asks the Court to preliminarily enjoin Respondents from re-detaining him before providing such a hearing.  Petitioner's motion is **GRANTED**, for the reasons explained below.

The right to be free of incarceration is at the heart of the Due Process Clause.  The Supreme Court has therefore required, as a general rule, a "hearing *before* the State deprives a person of liberty." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original).  This Court has been unable to identify any other context in which government agents may unilaterally detain someone without a hearing beforehand or immediately afterwards in front of a neutral decisionmaker, when a judge has previously ordered that person released.  Even parolees—for whom detention is the "default," who are subject to significant constraints on liberty, and who continuing to serve their criminal sentences for serious or violent felonies while released on parole—may not be detained and put back in prison without a court hearing within a few days. Nor may criminal defendants who are released on bond be detained and put in jail without a prompt hearing, no matter how serious their alleged crimes.  It is difficult to imagine any court blessing the constitutionality of a system in which parolees or criminal defendants would not receive any hearing before a judge for more than *six months* after being re-detained following their release, and were limited to asking law enforcement supervisors to reconsider the detention. Yet, that is essentially what Respondents propose here, even though participants in civil immigration proceedings are supposed to receive greater liberty protections than criminal defendants.

There are serious questions, at the very least, as to whether ICE may unilaterally deprive Petitioner of his liberty without timely review from a neutral decisionmaker.  Petitioner has shown that the balance of hardships tips sharply in his favor, and thus that issuance of a preliminary injunction is appropriate.

2

## II.     BACKGROUND

Petitioner, who is 31 years old, asserts through counsel that he was born in Mexico, and that he entered the United States in 2000 or 2001 when he was approximately six years old. (Dkt. No. 1-1 ¶ 5.)[1]  He was the victim of prolonged domestic violence at the hands of his stepfather, and developed PTSD, Generalized Anxiety Disorder ("GAD"), Major Depressive Disorder ("MDD"), and Insomnia.  (*Id.* ¶¶ 5, 26.)  Petitioner was convicted of attempted murder for a gang-related stabbing when he was 16, and was sentenced to thirteen years in prison.  (*Id.* ¶ 6.)  While he was incarcerated, Petitioner earned his high school diploma, and participated in programs including a victims impact group, group therapy, anger management, trauma recovery, and Bible studies.  (*Id.* ¶ 7.)

Upon his release from prison on December 9, 2021, Petitioner was immediately detained by ICE, and 19 days later ICE issued a Final Administrative Removal Order pursuant to 8 U.S.C. § 1231(a)(6) ("Removal Order"), finding that Petitioner was deportable due to an aggravated felony conviction.  (*Id.* ¶ 8.)  Subsequently, and while he was still detained, an IJ placed Petitioner into withholding of removal proceedings.  (*Id.* ¶¶ 9–10.)  Petitioner's application for withholding of removal was initially denied by an IJ and the decision was affirmed by the Board of Immigration Appeals ("BIA"), but has since been re-opened pursuant to a joint request by Petitioner and ICE, based on ICE's disclosure of Petitioner's personally identifiable asylum information on ICE's public website.  (*Id.* ¶¶ 12, 16.)  A hearing on the application was scheduled for January 31, 2028 (*id.* ¶ 23, p. 21), and was recently advanced to January 2027 based on ICE's request, according to Respondents' counsel at oral argument.

In June 2022, an IJ denied Petitioner release on bond.  (*Id.* ¶ 11.)  On October 13, 2022, and around March 1, 2023, ICE issued decisions to continue Petitioner's detention and deny release.  (*Id.* ¶¶ 13, 15.)  Petitioner sought a further custody redetermination hearing before an IJ based on his admission into an intensive re-entry program, Successful Treatment for Optimized

---

[1] All citations to page numbers refer to ECF pagination.

Programming ("STOP").  (*Id.* ¶ 14.)  On March 14, 2023, two weeks after ICE had most recently denied Petitioner's release request, an IJ granted Petitioner's release on a $5,000 bond and completion of the STOP program ("Bond Order").  (*Id.* at 13–14.)  The IJ declined to order "anything else" in terms of conditions of release—including GPS tracking—because the IJ found that those would "interfere with participation" in the STOP program.  (Dkt. No. 23-1 at 8–9.)  Despite this order, upon release, ICE required Petitioner to wear an ankle monitor until September 2023, a condition with which Petitioner complied.  (Dkt. 1-1 ¶ 18.)  ICE also imposed additional reporting conditions and a requirement that Petitioner "not commit any crimes."  (Dkt. No. 10 at 3.)

Since being released, Petitioner completed the STOP program and has successfully completed his parole.  (Dkt. No. 1-1 at 29, 32.)  He lives with and helps to care for his permanent resident mother, who is recovering from neck and shoulder surgery and unable to work.  (*Id.* at 61.)  During her recovery, Petitioner has supported his mother financially and provided home care and transportation to medical appointments.  (*Id.*)  Petitioner is employed as a cabinetmaker, has participated in various fellowships, and is building a business as a tattoo artist.  (Dkt. No. 1 ¶¶ 42–43.)  He is also a "well-recognized leader in the immigrants' rights movement in California," "seeking to improve conditions for ICE detainees" and volunteers as a community advocate and speaker for many organizations focused on immigrant rights.  (*Id.* ¶ 43–44.)

Petitioner states that he continues to struggle with his mental health, and that his symptoms have been aggravated over the past year due in part to his fear of re-detention.  (Dkt. No. 1-1 ¶ 27.)  Petitioner has been receiving mental health treatment since 2022, and is seeking evaluation and placement in a more intensive treatment program.  (*Id.* ¶¶ 26–27.)  Petitioner was arrested on May 14, 2025.  (*Id.* ¶ 28.)  The police report states that Petitioner believed his ex-girlfriend had been abducted and was being held in the building where he worked as a carpenter.  (Dkt. No. 7-3 at 12.)  According to the police report, Petitioner went to the building and, while holding a knife, told Juan, the proprietor of another business in the building, to give him the keys to his unit.  (*Id.* at 11.)  Juan stated that he was not in fear of Petitioner when he gave him the

keys, because Juan knew Petitioner. (*Id.*) Juan then allegedly saw Petitioner kick down the door of another unit. (*Id.*) Petitioner was arrested for robbery and vandalism, but was released the next day without any charges being filed. (Dkt. No. 1-1 ¶ 28.) Petitioner disputes that he committed a crime. (Dkt. No. 22 at 9.)

ICE learned of Petitioner's arrest and associated charges the next day, on May 15, 2025, and interviewed Petitioner soon afterwards, but did not order a police report or otherwise seek additional information about the incident at that time. (Dkt. No. 17 ¶ 7; Dkt. No. 1-1 ¶ 28.) Five weeks later, on June 23, 2025, Petitioner attended an in-person check-in with ICE, and was advised that de-escalation of his supervision would be recommended. (Dkt. No. 1-1 ¶ 29.) On the same date, ICE requested a copy of the police report relating to the arrest. (Dkt. No. 17 ¶ 10.) On June 26, 2025, Petitioner was told to present on July 1, 2025, for a "case review" with ICE, and Petitioner's counsel was advised that Petitioner would be detained on that day. (Dkt. No. 1-1 ¶¶ 30–31.) At the time of this decision, ICE concedes that it did not have a copy of the police report, which it received the next day on June 27, 2025. (Dkt. No. 17 ¶ 10.)

Petitioner promptly filed a petition for a writ of habeas corpus on June 29, 2025, on the basis that re-detention without a hearing before a neutral decisionmaker would violate his rights to substantive and procedural due process. (Dkt. No. 1.) The same day, Petitioner moved for a temporary restraining order and preliminary injunction enjoining his re-detention without such a pre-deprivation hearing. (Dkt. No. 2.)

The motion for temporary restraining order was heard the next day June 30, 2025, and granted. (Dkt. No. 30.) At the hearing, the Court proposed to hold the preliminary injunction hearing on July 10, 2025. The government stated that it wanted more time and was willing to allow the temporary restraining order to continue for a longer period, preventing Petitioner's re-detention, in order to brief the issues on a slower timeline. The hearing was therefore set for July 14, 2025, and then extended to July 15, 2025, to permit the government additional time to file its brief, with a stipulation from the parties that good cause justified extending the temporary restraining order beyond the usual fourteen-day period under Rule 65(b)(2). (Dkt. Nos. 18–19.)

5

Petitioner reported for his mandatory check-in as instructed on July 1, 2025. (Dkt. No. 23 ¶ 5.) At that time, ICE placed Petitioner back on GPS monitoring. (Dkt. No. 17 ¶ 11.) On July 2, 2025, the Santa Clara County District Attorney's Office charged Petitioner with one count of vandalism, to which Petitioner intends to plead not guilty, and Petitioner remains on release in that matter. (Dkt. No. 23 ¶ 22.)

## III. LEGAL STANDARD

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted) (emphasis in original). "[W]hen the Government is the opposing party," the final two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV. ANALYSIS

### A. Petitioner Has Raised a Serious Question Going to the Merits of His Procedural Due Process Claim

#### 1. The *Mathews* Test

In *Mathews v. Eldridge*, the Supreme Court outlined three factors relevant for the due process inquiry: (i) the private interest, (ii) the risk of an erroneous deprivation and the value of additional procedures sought, and (iii) the government's interest, including the burdens associated with the additional procedures sought. 424 U.S. 319, 335 (1976).[2] Petitioner has

---

[2] Though the government suggests that *Mathews* should not apply, the Supreme Court, the Ninth

6

established a serious question going to the merits under *Mathews*. He has identified a strong liberty interest in remaining on conditional release from detention, a significant risk of erroneous deprivation that can be ameliorated by providing a pre-detention hearing before a neutral arbiter, and the limited nature of the government interest in detaining Petitioner without access to a hearing.

### 2. Petitioner's Liberty Interest

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [due process clause] protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Therefore, individuals conditionally released from detention have a protected interest in their "continued liberty." *See Young v. Harper*, 520 U.S. 143, 147, 149, 152–53 (1997) (holding that a pre-parolee released to "reduce prison overcrowding" enjoy a protected liberty interest). It is well-established that the liberty interest that arises upon release is "*inherent* in the Due Process Clause." *Pruitt v. Heimgartner*, 620 F. App'x 653, 657 (10th Cir. 2015) (quoting *Boutwell v. Keating*, 399 F.3d 1203, 1212 (10th Cir. 2005) (emphasis in *Pruitt*).

The Supreme Court has recognized this protected liberty interest even though the released individual is subject to extensive conditions of release, like reporting regularly to a parole officer, not using alcohol, and not traveling out of the country. *Young*, 520 U.S. at 148; *see also Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others."); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same in the context of probation). Courts have recognized that, with the passage of time, a protectable liberty interest can "crystallize[]" even where an individual was released from prison in error, where the individual "reasonably thought the release was deliberate and lawful."

---

Circuit, and its sister circuits have consistently applied the *Mathews* test to non-citizens' due process challenges, where the non-citizen has entered and been residing in the United States. *See Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206–07 (9th Cir. 2022) (collecting cases).

7

*See Hurd v. D.C.*, *Gov't*, 864 F.3d 671, 683–84 (D.C. Cir. 2017).

Like the individuals in *Young, Morrissey*, and *Gagnon*, Petitioner has a liberty interest in his continued release on bond. Petitioner was granted release by a neutral third-party IJ after a hearing, and has been free on bond for more than two years. He has a job, and he is an active member of the community with a strong track record of volunteering, public speaking, and other advocacy efforts. His permanent resident mother, who is recovering from surgery, relies on him financially, for assistance at home, and to attend medical appointments. While out of custody, Petitioner has obtained treatment for his diagnosed mental health conditions. Furthermore, Petitioner has completed all requirements of his criminal sentence from 2013. ICE seeks to place him in civil detention. "Given the civil context, his liberty interest is arguably greater than the interest of parolees in *Morrissey*." *See Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) (citing *Morrissey*, 408 U.S. at 487).

Respondents raise three principal arguments in response. First, they argue that Petitioner has no liberty interest because his detention is mandatory under 8 U.S.C. § 1231(a)(6), and once he was released, he has been "subject to conditions of release." (Dkt. No. 15 at 13–14, 16–17.) As an initial matter, Respondents conceded at oral argument that if Petitioner is re-detained, there is no statutory or regulatory requirement mandating that he remain detained. Section 1231(a) provides that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). During that 90-day period, detention is mandatory. *Id.* § 1231(a)(2)(A). Some individuals—such as those with certain criminal convictions—"may be detained beyond the removal period," or may be "released," "subject to supervision under regulations prescribed by the Attorney General." *Id.* § 1231(a)(3) & (6). Pursuant to a preliminary injunction entered in another case in this district, individuals detained pursuant to Section 1231(a)(6) in the Ninth Circuit are currently entitled to a bond hearing every six months. *Aleman Gonzalez v. Barr*, 955 F.3d 762, 766 (9th Cir. 2020), *rev'd and remanded on other grounds sub nom. Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). Petitioner has already been detained for the "mandatory" 90-day window, and any

8

further detention would be subject to Section 1231(a)(6) under which he "may" be released.

However, Respondents argue that Petitioner's liberty interest is still less than those of individuals subject to Section 1226(a), who have not been ordered removed and have statutory rights to bond hearings before an IJ until their removal order becomes final. (Dkt. No. 15 at 16–17.) The Ninth Circuit has rejected this argument, holding that the "liberty interests of persons detained under § 1231(a)(6) are comparable to those of persons detained under § 1226(a)." *Diouf v. Napolitano*, 634 F.3d 1081, 1086–87 (9th Cir. 2011) ("*Diouf II*") (noting that any difference would be "at the margin").[3] The court reasoned that both groups could be subject to prolonged detention, and that individuals subject to 1231(a)(6) may still seek to challenge or delay their removal, which augments their liberty interest. *Id.* Petitioner is an example of this, as he successfully jointly moved with the government to reopen his withholding of removal proceedings.

The fact that Petitioner is subject to discretionary conditions of release likewise does not mean he lacks a protectable liberty interest and can be re-detained without process. Respondents observe that, in *Zadvydas*, the Supreme Court instructed that removable non-citizens' "release may and should be conditioned on any of the various forms of supervised release that are appropriate in the circumstances, and [they] may no doubt be returned to custody upon a violation of those conditions." 533 U.S. at 700. However, *Zadvydas* provided no instruction for what process is necessary to protect non-citizens' liberty interest when the government seeks to return them to custody. Instead, *Morrissey* and *Young* address that issue, explaining that the deprivation is a "grievous loss" that can be taken away only upon review at a hearing before a neutral arbiter, regardless of whether government agents otherwise have statutory authority to re-detain. *Morrisey*, 408 U.S. at 482, 489; *see also Young*, 520 U.S. at 148.

---

[3] Although the Supreme Court rejected the Ninth Circuit's statutory interpretation in *Diouf II*, the Court declined to address *Diouf II*'s due process analysis, which thus remains binding precedent. *See Jennings v. Rodriguez*, 583 U.S. 281, 313 (2018) ("we do not reach" the "constitutional arguments on their merits").

Respondents' second argument is that, because the Ninth Circuit in *Diouf II* found that requiring detainees to wait 90 days to have their initial custody determinations reviewed did "not raise serious constitutional concerns," Petitioner could not be entitled to a more prompt review. (Dkt. No. 15 at 20–21 (citing *Diouf II*, 634 F.3d at 1091).) But a released individual's interest in avoiding re-detention is different from a detainee's interest in having ongoing periodic reviews of prolonged detention. "[P]ut succinctly, revocation implicates a liberty interest that inheres in the Due Process Clause, and the denial of eligibility for [release] does not." *Pruitt*, 620 Fed. App'x. at 657. Thus, although prisoners may not have a constitutional right to be assessed for parole, parolees who have already been released have a constitutional due process right to a hearing prior to being re-incarcerated. *Cf. Jago v. Van Curen*, 454 U.S. 14, 17, 21 (1981) (distinguishing the liberty interests of a parolee who had *already* been released from those of a prisoner who expected to receive parole but was denied release, which were not cognizable). Likewise, even if immigration detainees must wait months before a periodic re-review of their detention, those already released on immigration bond possess an interest in their continued liberty, which grows over time, and a due process right to a hearing before being re-detained.

Furthermore, because Petitioner has had an individualized determination from an IJ, Petitioner is in a different position from individuals initially detained under Section 1231(a)(2)(A). It is conceivable that due process might permit a delay in assessing individuals for release when they are initially detained by ICE upon their completion of a prison sentence, due to the high probability of imminent removal and thus the presumption of their heightened potential for flight. But, even assuming that to be true, those presumptions are no longer applicable after a neutral adjudicator has performed an individualized assessment and found no flight risk or danger, and determined that removal is not imminent. Moreover, those who remained in detention since the completion of their sentences have not accrued the same substantial liberty interest as those, like Petitioner, who have been on release for years.

Respondents' third argument is that Petitioner's liberty interest is so diminished as a non-citizen that he may be detained without any meaningful process. (Dkt. No. 15 at 18–19.) "[T]he

10

Due Process Clause applies to all 'persons' within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see also Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("the government's discretion to incarcerate non-citizens is always constrained by the requirements of due process"). Petitioner, who has resided in the United States since he was a child, is entitled to this constitutional protection. *Contrast Zadvydas*, 533 U.S. at 693, *with DHS v. Thuraissigiam*, 591 U.S. 103, 138–140 (2020) (holding that an individual apprehended 25 yards into U.S. territory had not "effected an entry," and his due process rights related to his expedited removal were limited to those "provided by statute"). In *Zadvydas*, an individual who had been ordered removed challenged his indefinite confinement under 8 U.S.C. § 1231(a)(6). 533 U.S. at 682. The government argued that "whatever liberty interest [Zadvydas] possess[es], it is 'greatly diminished' by [his] lack of a legal right to live at large in this country,'" and he could be detained indefinitely. *Id.* at 696 (citations omitted). The Supreme Court declined to so limit his due process right, finding that even though Zadvydas was detained and deportable, his liberty interest was "at the least, strong enough to raise a serious question" regarding the permissibility of detaining him indefinitely. *Id.* Petitioner's liberty interest is even greater than Zadvydas's. Unlike Zadvydas, Petitioner was ordered released by an IJ, subject to conditions, and has been freely and openly living, working, and caring for his mother for more than two years while he awaits a final hearing on his withholding of removal application.

In the end, Respondents provide no principled reason for why Petitioner's liberty interest should be less than that of a U.S. citizen parolee or probationer. Although the Court "must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature," *Rodriguez Diaz*, 53 F.4th at 1208 (quotation omitted), this is no less true in the context of a state's interest over parolees. The Supreme Court has instructed that "there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," *Greenholtz v. Inmates of Neb. Penal and Corr. Complex,* 442 U.S. 1, 7 (1979), and if released a state has "an

11

'overwhelming interest' in ensuring that a parolee complies with [the conditions of parole] and is returned to prison if he fails to do so." *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365 (1998). The courts are "averse to imposing federal requirements upon the parole systems of the States." *Id.* at 369. The *Morrissey* court acknowledged these state interests, but found that the "State has no interest in revoking parole without some informal procedural guarantees." 408 U.S. at 483. If a parolee serving out a sentence for a violent crime, and subject to highly restrictive conditions of release, has a sufficiently strong liberty interests to be entitled to a hearing prior to re-incarceration, then a non-citizen freed from civil detention on bond likely has a similar entitlement.

This Court has been unable to identify any other context in which government agents could permissibly take someone who had been released by a judge, lock up that person, and have no hearing either beforehand or promptly thereafter. The Court issued a notice of questions the day prior to oral argument inviting Respondents to identify any examples of a court blessing the constitutionality of such an arrangement. Respondents' counsel conceded that they could identify none. To the contrary, numerous district courts have uniformly recognized that there are, at the very least, serious questions as to whether due process requires non-citizens released by a valid order from an IJ to receive a hearing before a neutral arbiter either before or immediately after re-detention.[4] The Court has been unable to identify any court that has agreed

---

[4] *See*, *e.g.*, *Meza v. Bonnar*, No. 18-cv-02708-BLF, 2018 WL 2554572 (N.D. Cal. June 4, 2018)*; Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. 2019); *Vargas v. Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312 (N.D. Cal. Aug. 23, 2020); *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050 (N.D. Cal. 2021); *Romero v. Kaiser*, No. 22-cv-02508-TSH, 2022 WL 1606294 (N.D. Cal. May 20, 2022); *Enamorado v. Kaiser*, No. 25-cv-04072-NW, 2025 WL 1382859 (N.D. Cal. May 12, 2025); *Garcia v. Bondi*, No. 25-cv-05070-JSC, 2025 WL 1676855 (N.D. Cal. Jun. 14, 2025); *Diaz v. Kaiser*, 25-cv-05071, 2025 WL 1676854 (N.D. Cal. Jun. 14, 2025); *Doe v. Becerra*, No. 25-cv-00647-DJC, 2025 WL 691664 (E.D. Cal. Mar. 3, 2025); *Garro Pinchi v. Noem*, No. 25-cv-05632-RFL, 2025 WL 1853763 (N.D. Cal. July 4, 2025); *Singh v. Andrews*, No. 25-cv-00801, 2025 WL 1918679 (E.D. Cal. July 11, 2025); *Castanon Domingo v. Kaiser.*, No. 25-cv-05893-RFL, 2025 WL 1940179 (N.D. Cal. July 14, 2025); *cf. United States v. Cisneros*, No. 19-cr-00280-RS, 2021 WL 5908407 (N.D. Cal. Dec. 14, 2021) (in the context of a motion to suppress evidence seized during an ICE arrest, finding no constitutional violation based on the entitlement

12

with Respondents' position that those non-citizens may be re-detained without any such hearing for at least six months, and Respondents have identified none.

### 3. The Risk of Erroneous Deprivation

There is a substantial risk that Petitioner will be erroneously deprived of his liberty interest absent a pre-detention hearing before a neutral arbiter. ICE had repeatedly rejected Petitioner's requests to be released during his initial detention. Nonetheless, an IJ, who is a neutral third party, reviewed the evidence and made a factual determination after a hearing that Petitioner was not a flight risk, did not pose a danger to society, and was entitled to be released on bond. (Dkt. No. 23-1 at 9.) That determination was not appealed by ICE. Yet, Respondents take the position that notwithstanding a neutral arbiter's determination that Petitioner should be released, ICE is entitled to unilaterally terminate the IJ's order by re-detaining Petitioner without a hearing for at least six months, based on ICE's own determination in its sole discretion that additional conditions of release unilaterally set by ICE had been violated. The risk of arbitrary or erroneous deprivation in these circumstances is undeniably stark.

Respondents argue that the post-detention administrative process described in 8 C.F.R. § 241.4 will safeguard Petitioner from the risk of erroneous deprivation. But each of those procedures is essentially no more than a request to ICE's arresting agents or their supervisors at headquarters to reconsider the agency's unilateral detention decision. Section 241.4(*l*)(1) requires notice and "an initial informal interview [with ICE] promptly" after return to custody "to respond to the reasons for revocation." There is no further description of procedural safeguards imposed by this "informal interview," nor is there any provision permitting consideration by a neutral arbiter. Three months later, ICE is required to perform a records review and interview, including an "evaluation of any contested facts." § 241.4(*l*)(3). Once again, there is no opportunity to have a neutral party evaluate ICE's unilateral determination of

---

to a "prompt hearing" post-arrest hearing under Section 1226(b)); *Uc v. Kaiser*, No. 22-cv-04369-CRB, 2022 WL 9496434 (N.D. Cal. Oct. 14, 2022) (denying habeas petition because the bond decision had been vacated after petitioner's release).

13

the contested facts. 8 C.F.R. § 241.4(h) and (k) contemplate further custody review by ICE, with the same limitations. The lack of any neutral review creates a heightened risk of deprivation for Petitioner. Indeed, when Petitioner was previously detained, he was denied bond by ICE only days before the IJ granted Petitioner the right to be released.[5]

Additionally, Petitioner is subject to an immigration detention provision that "lack[s the] process" available under more protective schemes, such as Section 1226(a). In *Rodriguez Diaz*, the Ninth Circuit found due process satisfied in the prolonged detention context by procedural protections that were "subject to numerous levels of review, each offering [] the opportunity to be heard by a neutral decisionmaker." 53 F.4th at 1210. "These procedures ensured that the risk of erroneous deprivation would be 'relatively small.'" *Id.* By contrast, an individual detained under Section 1231(a)(6) has no statutory or regulatory entitlement to a bond hearing before an IJ whatsoever. Respondents offer that a preliminary injunction in another case in this district would require a bond hearing after six months. *See Aleman Gonzalez,* 955 F.3d at 766. Assuming the *Aleman Gonzalez* preliminary injunction remains in place in six months, though, it would be cold comfort for Petitioner to be re-released by an IJ after waiting six months in custody for the error to be corrected. The erroneous deprivation of liberty, along with the concomitant damage to Petitioner's mental health and impact on Petitioner's family, will have already taken place. Moreover, according to Respondents' reasoning, ICE could simply turn around the next day and re-detain Petitioner after the IJ's release, and he would be unable to have the decision reviewed by a neutral arbiter for another six months.

Magnifying the risk of erroneous deprivation, Respondents stated at oral argument that

---

[5] Respondents describe Petitioner's challenge as a "facial attack" on 8 C.F.R. § 241.4(*l*). (Dkt. No. 15 at 16.) But Petitioner does not challenge Section 241.4(*l*) as unconstitutional in all applications. Instead, Petitioner challenges it as applied to him. Specifically, he challenges Respondents' ability to re-arrest him without a pre-deprivation hearing before a neutral arbiter where (i) the re-arrest would occur more two years after his release from detention by a neutral third party who determined that he was neither a flight risk nor a danger; (ii) Petitioner's detention would undisputedly last at least six months, during which he would not receive a custody redetermination hearing; (iii) Respondents have evinced a distinct lack of urgency in re-detaining Petitioner; and (iv) Respondents have put in place additional safeguards to ensure Petitioner does not flee.

ICE may add its own conditions of release, even if rejected by the IJ at the hearing, and may re-detain unilaterally for any "change in circumstances" or any violation of those conditions. According to Respondents, it does not matter whether the change or violation materially impacts the required purposes of civil immigration detention: that is, "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk." *In re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006) (describing required custody re-determination factors); *see also Zadvydas*, 533 U.S. at 690 (identifying risk of flight and danger to the community as the statutory purposes of civil immigration detention).[6] In other words, according to Respondents, ICE could re-detain those released for purely technical violations, like being one minute late to a check-in.

Taken to its logical extreme, this position would permit ICE to regularly re-detain individuals released by an IJ on bond over ICE's objections, pursuant to Section 1231(a)(6), even if the re-detention occurred within days of their release and without any material change in circumstances. ICE's detention decisions would then be effectively unreviewable by any neutral decisionmaker for at least six months, and if the IJ ordered the person released again, ICE could repeat the process the next day. In this alternate universe, ICE would never need to appeal a bond decision, given its unfettered authority to set additional conditions of bond and to re-detain individuals at will. That is a recipe for arbitrary and erroneous deprivations of liberty. *See Zadvydas*, 533 U.S. at 692 ("The Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.'") (quoting *Superintendent, Mass. Correctional Institution at Walpole v. Hill*, 472 U.S. 445, 450 (1985)).

By contrast, allowing a neutral arbiter to review the facts would significantly reduce the risk of erroneous deprivation. Respondents' representations regarding their decision to re-detain Petitioner highlight the need for such a hearing. Respondents' Opposition to the Motion argues

---

[6] In their briefing, Respondents took an even more aggressive position that "re-detention here is not subject to the 'changed circumstances' standard" at all. (Dkt. No. 15 at 14 n. 3.)

that Petitioner violated a condition that he not "commit any crimes," a determination that Petitioner contests. (Dkt. No. 15 at 14.) Respondents state that "after reviewing the details of the police report, Officer Canning—the Deportation Office responsible for supervising Petitioner, confirmed the *presumptive determination* that re-detention was appropriate." (Dkt. No. 15 (emphasis added).) ICE did not receive the police report until June 27, but by June 26 it had made the presumptive determination and informed Petitioner's counsel that Petitioner would be re-detained. Three days earlier, however, ICE had interviewed Petitioner and then informed him that it planned to de-escalate his supervision. There is no evidence in the record of what the basis for ICE's June 26 "presumptive determination" was, or why ICE changed course after its earlier determination to de-escalate. Such unexplained and contradictory decisionmaking raises a heightened risk of erroneous deprivation of rights absent review by a neutral arbiter.

The Supreme Court has consistently held that "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *See Zinermon*, 494 U.S. at 127 (emphasis in original). Certainly, there may be situations that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128 (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable). However, absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due process, particularly where an individual has been released on bond by an IJ. *See*, *e.g.*, *Ortega*, 415 F. Supp. 3d at 970; *Vargas*, 2020 WL 5074312, at *3–4; *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050, 1056 (N.D. Cal. 2021).

On the record, no such urgency exists here. Respondents waited over six weeks from the incident at issue to try to arrest Petitioner. As Respondents' counsel conceded at the temporary restraining order hearing, ICE likely had the ability to obtain the police report when it learned of the arrest in mid-May. Yet, ICE did not consider it high priority. (Dkt. No. 17 ¶ 9.) Furthermore, ICE initially elected to proceed by notifying Petitioner five days in advance of their plan to arrest him at his check-in, indicating that they did not fear he would flee or refuse to comply with the requirements of his release, even with knowledge of his certain detention. Respondents' course of conduct demonstrates their lack of urgency, as does Respondents'

16

request for an extended schedule as to this preliminary injunction motion.

### 4. The Burden on Respondents Does Not Outweigh Petitioner's Interests

Regarding the third *Mathews* factor, Respondents raise their interest in successfully removing deportable non-citizens, ensuring compliance with their orders of supervision, and protecting the public. These interests are indisputably weighty. However, in this case they do not appear to be significantly impaired by the requirement of a pre-deprivation hearing. As discussed above, two months have now passed since Petitioner's arrest and release. This delay was a result of ICE's decision to prioritize other matters. Since then, ICE has taken further steps to minimize risk of flight and ensure compliance, including requiring Petitioner to wear a GPS monitor and increasing his periodic check-ins.

Respondents submit no evidence that requiring a pre-deprivation hearing would result in a significant delay. To the contrary, Respondents conceded at the hearing that, if a court order requires a pre-deprivation hearing and ICE wishes to have the hearing take place on an expedited basis, ICE may move to advance the hearing date. At oral argument, Petitioner's counsel noted that, in her practice before the immigration courts, statutorily required bond hearings are routinely scheduled within 14 days, an estimate that Respondents did not contest. Moreover, detention remains an available option if an IJ orders it after providing Petitioner an opportunity to contest the detention and to dispute the account of the events in the police report. On this record, the additional time for a hearing does not appear to impinge on Respondents' interests.

At oral argument, Respondents characterized Petitioner's requested relief as an "unprecedented" pre-arrest bond hearing, because they argue that it is not expressly contemplated by the applicable statutory scheme and therefore there is no "regulatory or statutory authority to provide a hearing like that." However, the concept that an individual who is not subject to detention may request custody redetermination from an IJ is not novel. For example, an individual who is "released from custody" may request a hearing before an IJ within seven days to seek "amelioration of the terms of release." 8 C.F.R. § 1236.1(d)(1). Courts in this district have also regularly required pre-arrest hearings pursuant to the due process clause.

17

*See*, *e.g.*, *Ortega*, 415 F. Supp. 3d at 970; *Vargas*, 2020 WL 5074312, at *3–4; *Jorge M.F.*, 534 F. Supp. 3d at 1056. Finally, the *Aleman Gonzalez* preliminary injunction requires bond hearings in a context not expressly contemplated under the relevant statutory scheme, yet Respondents acknowledge that IJs have been successfully providing hearings pursuant to the court's order for several years. Therefore, Petitioner's request is neither unprecedented nor does it appear to present insurmountable logistical barriers.

Respondents also express concern about the administrative costs of requiring a hearing. But Petitioner would likely need to receive such a hearing at the six-month mark anyway. Petitioner cannot be immediately deported if he is re-detained because he is awaiting a hearing on his withholding of removal application, which is currently set for January 2027. Even if the hearing were moved further forward, the undisputed record is that a final determination on the merits of the application will take a minimum of nine months. (Dkt. No. 23 ¶ 24.) Petitioner would thus likely still be in custody at the six-month mark if re-detained, and would receive a bond hearing at that time under the *Aleman Gonzalez* preliminary injunction. As such, the immigration courts would likely hear Petitioner's challenge to his re-detention either way, whether on a pre-deprivation or post-deprivation basis, so there is no cost savings from waiting to hold the hearing. Indeed, a pre-deprivation hearing could reduce administrative costs by potentially avoiding an erroneous deprivation of liberty, which would save the costs of unnecessary detention. *See Meza v. Bonnar*, 18-cv-02708-BLF, 2018 WL 2554572, at *4 (N.D. Cal. June 4, 2018) (observing that "[t]he costs to the public of immigration detention are 'staggering'" (quoting *Hernandez*, 872 F.3d at 996)).

In sum, at the very least, Petitioner has raised a serious question going to whether the *Mathews* factors are satisfied in his favor on his procedural due process claim.[7]

---

[7] Because the serious questions prong is satisfied as to Petitioner's procedural due process claim, the Court does not reach the likelihood of success as to Petitioner's substantive due process claim. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1139 (9th Cir. 2011) (declining to reach remaining claims after finding a serious question going to the merits of one claim).

### B. Petitioner Has Shown Irreparable Harm, and the Balance of Equities and Public Interest Favor an Injunction

The likelihood of irreparable harm in this case is high. "[T]he irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment)" are self-evident. *See Hernandez*, 872 F.3d at 995. Absent an injunction, Petitioner will be detained and will not be entitled to challenge his re-detention before a neutral adjudicator for a minimum of six months. Detention will interrupt Petitioner's ongoing mental health treatment, with potentially severe long-term consequences for him. It will interrupt Petitioner's advocacy work in the community, and Petitioner may lose his job. Petitioner will be unable to care for his mother or provide her support while she continues to recover from surgery. *See Vargas*, 2020 WL 5074312, at *4.

The balance of harms and public interest factors merge when the government is the opposing party. *Nken*, 556 U.S. at 435. The public has an interest in the orderly and efficient administration of this country's immigration laws, but also has a strong interest "in upholding procedural protections against unlawful detention." *See Vargas*, 2020 WL 5074312, at *4 (finding the balance of hardships tipped in petitioner's favor because his detention would "subject[] his family to economic hardship and the loss of their caretaker"). Petitioner has demonstrated that avoiding collateral hardship to his mother, whom he supports financially and cares for, and reducing his risk of further mental health complications would serve the public interest. Further, "the general public's interest in the efficient allocation of the government's fiscal resources" is served by avoiding the cost of potential erroneous detention. *Hernandez*, 872 F.3d at 996.

Petitioner has sufficiently demonstrated serious questions going to the merits of his procedural due process claim. The balance of hardships tips sharply in his favor, as well as the *Winter* factors of likelihood of irreparable injury and public interest.

19

V.  **ORDER**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Petitioner's Motion for a Preliminary Injunction is **GRANTED**.  Respondents are **ENJOINED AND RESTRAINED** from re-detaining Petitioner without notice and a pre-deprivation hearing before an Immigration Judge to evaluate whether Petitioner's re-detention is warranted based on flight risk or a danger to the community.  This Order shall remain in effect until further order of the Court.  No security bond is required, as the government provides no evidence of costs it will incur due to Petitioner's release.

**IT IS SO ORDERED.**

Dated: July 17, 2025

RITA F. LIN
United States District Judge